UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE SYNGENTA AG MIR162 CORN
LITIGATION

No. 2:14-MD-02591-JWL-JPO

THIS DOCUMENT RELATES TO:

MDL No. 2591

*The DeLong Co., Inc. v. Syngenta AG, et al.,* No. 17-cv-2614-JWL-JPO

**PRETRIAL ORDER**

A telephonic pretrial conference was conducted in this case on September 29, 2020, by U.S. Magistrate Judge James P. O'Hara.  The plaintiff, The DeLong Co., Inc. ("DeLong"), appeared through counsel, William B. Chaney, Andrew K. York, Rachel E. Schwartz, and Jerry Santangelo.  The defendants, Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Seeds, Inc. (now known as Syngenta Seeds, LLC), and Syngenta Biotechnology, Inc. (now merged with Syngenta Crop Protection, LLC, with Syngenta Crop Protection, LLC, as the remaining entity) (collectively, "Syngenta" or "Defendants"), appeared through counsel, Edwin J. U, David I. Horowitz,  Thomas P. Schult, and  Jennifer B. Wieland.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval,

1

or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan.

Rule 16.2(b).

## 1.      PRELIMINARY MATTERS.

This Pretrial Order applies only to Count IV (negligence) of DeLong's Original

Complaint, ECF No. 1, which is the sole Count remaining in this litigation.[1]

**a.      Subject Matter Jurisdiction.**  Subject matter jurisdiction is invoked under

28 U.S.C. § 1332(a)(1)-(3), and is not disputed.

**b.      Personal Jurisdiction.**  The Court's personal jurisdiction over the parties is

not disputed.

**c.      Venue.**  Venue in this Court is not disputed.

**d.      Governing Law.**  Subject to the Court's determination of the law that applies

to the case, the parties believe and agree that the substantive issues in this case are governed

by the following state laws:

The Wisconsin law on negligence

The Wisconsin law on punitive damages

---

[1]      Citations to electronic court filings ("ECF No. ____") refer to filings in this specific case (2:17-cv-02614) unless otherwise indicated.  In its August 26, 2019 Memorandum and Order (ECF No. 23), the Court granted Syngenta's Motion to Dismiss Counts I (Lanham Act), II (Violation of Minn. Stat. §§ 325D.13 and 325F.69), III (Trespass to Chattels), V (Fraudulent Misrepresentation), and VI (Negligent Misrepresentation).  DeLong expressly preserves those allegations, and the right to appeal that ruling and any related orders, following trial.

**2.      STIPULATIONS.**[2]

    **a.**      The following facts are stipulated.  The parties may later agree to additional

stipulated facts in advance of trial.

       1.      DeLong is a citizen of Wisconsin.

       2.      DeLong is headquartered in Clinton, Wisconsin.

       3.      DeLong's business includes the sale of U.S. Dried Distillers Grains

with Solubles (otherwise known as "DDGS") for export, including sales scheduled for

delivery to China.

       4.      DDGS are corn ethanol by-products that are often used as feed for

livestock.

       5.      Syngenta AG is a corporation organized and existing under the laws

of Switzerland with its principal place of business in Switzerland.

       6.      Syngenta Crop Protection AG is a corporation organized and existing

under the laws of Switzerland with its principal place of business in Switzerland.

       7.      Syngenta Corporation is a corporation organized and existing under

the laws of the State of Delaware with its principal place of business in Delaware.

---

[2]      By stipulating to the facts set forth in this section, the parties do not waive, and instead expressly preserve, each side's right to elicit testimony and present evidence regarding these facts, and to assert additional facts, at summary judgment or trial.  These stipulations are without waiver of any party's evidentiary objections.

8.      Syngenta Crop Protection, LLC, is a limited liability company organized and operating under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

9.      Syngenta Crop Protection, LLC, is a subsidiary of Syngenta Seeds, LLC.

10.     Syngenta Biotechnology Inc. merged with Syngenta Crop Protection, LLC, effective on December 31, 2014.  The named surviving entity from the merger of Syngenta Biotechnology and Syngenta Crop Protection, LLC is Syngenta Crop Protection, LLC.

11.     Syngenta Seeds, LLC (previously known as Syngenta Seeds, Inc.) is a Delaware limited liability company.

12.     Syngenta Seeds, LLC's sole member is Syngenta Corporation.

13.     Syngenta AG's subsidiaries report their finances to their parent corporation and Syngenta AG's financial statements reflect the finances of its subsidiaries.

14.     MIR162 is a genetically-modified corn event produced by Syngenta that is included in corn seeds Syngenta markets and sells as Agrisure Viptera ("Viptera" or "Agrisure Viptera").

15.     Event 5307 is a genetically modified corn event produced by Syngenta that is included in corn seeds Syngenta markets and sells as Agrisure Duracade ("Duracade" or "Agrisure Duracade").

16.     Syngenta filed its Public Interest Assessment Supporting Registration of MIR162, Bt11xMIR162, and Bt11xMIR162xMIR604 Maize with the U.S. Environmental Protection Agency ("EPA") in May 2007.

17.     Syngenta submitted a Petition for Determination of Nonregulated Status for Insect-Resistant MIR162 Maize to the United States Department of Agriculture ("USDA"), which was dated August 31, 2007.

18.     The USDA deregulated MIR162 in April 2010.

19.     MIR162 received regulatory import approval in China in December 2014.

20.     Syngenta filed its Public Interest Assessment Supporting US EPA Registration of 5307 Corn and the Breeding Stacks Bt11 × MIR604 × TC1507 × 5307 and Bt11 × MIR162 × MIR604 × TC1507 × 5307 Corn with the EPA in March 2011.

21.     Syngenta filed its Petition for Determination of Nonregulated Status for Rootworm-Resistant Event 5307 Corn to the USDA, which was dated April 22, 2011.

22.     The USDA deregulated Event 5307 in January 2013.

23.     Event 5307 received regulatory import approval in China in July 2017.

24.     Syngenta began selling Viptera in the United States in 2010 for planting in spring 2011.

25.     Syngenta began selling Duracade in the United States in 2013 for planting in spring 2014.

26.     One place where corn futures and options are traded is the Chicago Board of Trade.

27.     China rejected certain shipments of U.S. corn for a period of time starting in November 2013.

**b.**     At this time, the parties have not stipulated to the admissibility of any exhibits for purposes of summary judgment or trial.  The parties will continue to meet and confer regarding potential stipulations.

**3.     FACTUAL CONTENTIONS.[3]**

**a.     Contentions of Plaintiff.**

DeLong asserts the following allegations in connection with the cause of action it is pursuing.  Mindful of the Pretrial Order's Instructions not to "recite every factual nuance that will be presented at trial," DeLong includes a concise summary of its allegations.  A more detailed statement of DeLong's factual contentions is included in DeLong's Original Complaint, ECF No. 1.

DeLong has been in the business of serving local farmers for over 100 years.  It is an exporter of corn and DDGS, among other commodities.  DeLong's operations are

---

[3]     Neither party waives their arguments that these factual contentions may be barred by the Court's forthcoming summary judgment, *Daubert*, and motion *in limine* rulings.

located in Wisconsin, Illinois, Nebraska, Kansas, New Jersey, Ohio and New York. DeLong has developed an extensive network of grain elevators and grain handling and processing facilities (including container transloading facilities, rail terminals and country elevators) and transportation assets (including trucks, and rail cars) that it uses to buy, store, clean, process, and transport agricultural commodities.   DeLong purchases these agricultural commodities directly from farmers or other suppliers, including grain elevators and ethanol plants.  DeLong exports significant amounts of corn, soybeans and DDGS to Asia.  DeLong has become one of the largest exporters of DDGS to China as China's growing population and burgeoning middle class created significant demand for corn and corn by-products, including DDGS.

By 2011, DeLong was steadily growing its export business to China, including the sale of DDGS and corn.  DeLong made substantial investments to support its growing China business.  For example, DeLong invested in facilities to ship corn and DDGS to China in containers which allowed DeLong greater flexibility to meet the needs of its Chinese customers.

Syngenta is a biotech company that develops and sells agricultural products, including genetically-modified ("GM") corn seeds.  Syngenta developed MIR162, which is a GM trait included in corn seeds Syngenta markets and sells as Viptera, and Event 5307, which is a GM trait included in corn seeds Syngenta markets and sells as Duracade. Harvested U.S. corn is sold as a commodity in countries around the world on a global

7

market.  China is one of a number of countries that has purchased U.S. corn and U.S. corn byproducts, such as DDGS.  By 2010, China was a large and growing export market for U.S. produced corn and DDGS.

Countries across the world have their own processes and timetables for reviewing and approving new GM traits for cultivation (i.e., allowing the GM seed to be grown in-country) or importation (i.e., allowing the crop containing the GM trait to be imported and sold in-country).  Some countries do not allow any GM products to be cultivated or imported, some freely allow GM products and others, including the United States and China, have regulatory systems designed to individually evaluate new GM products to ensure that such GM products are safe for humans, animals and the environment.

Biotech companies introducing new GM products have educated industry stakeholders regarding the consequences that can occur from selling new GM products before import approval is obtained in export markets like China.  An unapproved trait that is widely commercialized can and, without adequate precautions spearheaded by the biotech company, likely will end up in exports to countries that have not approved that GM product, which can cause significant trade disruptions.  This potential harm is why biotech companies, including Syngenta, have pledged to stakeholders to act reasonably in the timing, scope and manner of introducing a new GM product to ensure that export markets for that crop are preserved.  Biotech companies do not generally commercialize a new GM trait until receiving approval in all important export markets.

4827-6471-1370.7

In 2007, Syngenta applied to the United States Department of Agriculture for deregulation of the MIR162 trait in the United States.  Syngenta also sought import approval of MIR162 in countries around the world that were important corn and corn by-product export markets for U.S. corn farmers.  Specifically, Syngenta applied for import approval in China in 2010, which Syngenta's executives and employees recognized as an important and growing market for U.S. corn exports.  The harm that would result if Syngenta commercialized Viptera without Chinese approval was foreseeable to and actually foreseen by Syngenta and its executives.  When the USDA deregulated MIR162 in 2010, China and other major import markets had not yet approved MIR162.  Syngenta had a decision to make.  It could: wait until major import markets like China approved Viptera, which it had pledged to do; undertake a narrowly-tailored launch of Viptera in the United States, ensuring that Viptera corn would not enter the corn export market; or it could immediately and widely sell Viptera throughout the United States, thereby creating the risk that U.S. corn farmers would lose the Chinese export market.  Syngenta chose to widely market and sell Viptera to U.S. corn farmers beginning in 2010.

By regulation, China required specific in-country tests of new GM products to ensure that the products are safe for the Chinese people and China's environment.  From the submission of the initial application, which Syngenta made in February 2010, through the in-country testing process, the average Chinese approval time for a new GM product was at least 28 months, assuming there are no significant delays in completing the in-

4827-6471-1370.7

country tests or concerns raised by the application and testing.  At the time Syngenta decided to sell Viptera in the United States, Syngenta knew or should have known it was unlikely to receive Chinese approval by the time Viptera corn was harvested in 2011.

On or about May 6, 2010, Syngenta received official permission from China to import Viptera seeds for in-country testing.  Because of an internal "legal entity" issue within Syngenta, Syngenta did not import Viptera seeds into China for testing until June 2011, a delay of nearly a year that ensured no Chinese in-country tests occurred in 2010 and risked missing the planting season for in-country tests in 2011.  Ultimately, Syngenta rushed the in-country tests and the analysis of these tests to submit its new application in November 2011.  This November 2011 application did not reference or explain Syngenta's published Daphnia research showing that Viptera could cause environmental problems.  By regulation, China then had 270 days to review or reject this application.

China rejected this application in May 2012 and identified scientific issues.  Throughout 2012–2014, Syngenta submitted new applications.  Each time, China reviewed and rejected the application citing on-going scientific concerns about the safety and environmental impact of Viptera, including questions related to Syngenta's Daphnia research and Syngenta's inadequate responses to its questions.  Ultimately, Syngenta promised to publish a peer-reviewed paper reconciling its original Daphnia study results with additional studies that did not show a similar environmental risk, which Syngenta did in October 2014.  In December 2014, China approved Viptera for import.

Because the Chinese approval process is confidential, Syngenta alone knew the status of its Chinese MIR162 applications.  Throughout the application process and as uncovered in discovery, Syngenta undertook actions designed to enhance its efforts to broadly commercialize Viptera in the U.S.   Syngenta's actions included the misrepresentations and omissions detailed in paragraphs 330–376 of the Complaint. Syngenta intentionally mislead stakeholders regarding the scope of the Viptera launch, including telling stakeholders in February 2011 that Syngenta would sell only enough Viptera seed in 2011 to plant 50,000 acres.  In August 2011, Syngenta sued Bunge North America, Inc. to prevent Bunge from erecting warning signs or refusing to accept Viptera. Syngenta intentionally and misleadingly informed its stakeholders regarding the anticipated timeline for Chinese approval of Viptera.  By way of example only, Syngenta initially told its stakeholders in February and March 2011, that it expected Chinese approval before the first Viptera harvest in fall 2011.  On multiple occasions, Syngenta then told its stakeholders that approval was expected in Q1 2012.  For example, on June 29, 2011, Syngenta told its stakeholders that Viptera approval was expected by April 2012 and later sent an August 17, 2011 letter to farmers stating that it expected approval in late March 2012.  In July and August 2011, Syngenta created internal documents in which stakeholders were to be told that Viptera approval was expected in Q1 2012.  Syngenta similarly told the NGFA that approval was expected by the end of Q1 2012.  In 2012, Syngenta told its stakeholders that it was merely waiting on an official signature.  Syngenta

11

knew or should have known that these types of statements were misleading. Syngenta additionally misled stakeholders regarding the importance of China as an export market for U.S. corn, including by distributing a "Plant with Confidence Fact Sheet" that contained deceptive statements regarding the importance of China. Finally, Syngenta misrepresented and omitted material information regarding the scope and nature of China's scientific questions regarding its Viptera applications and Syngenta's decision to seek Chinese cultivation approval of Viptera.

In March 2013, while the Viptera application was still pending, Syngenta submitted an application for import approval for Event 5307. Even though Syngenta estimated that Chinese approval of Duracade would not occur until at least fall 2015, Syngenta launched Duracade in the United States in fall 2013 without Chinese approval.

In summer 2013, Chinese buyers stopped placing orders for U.S. corn despite a growing need for livestock feed and the availability of U.S. corn. In September 2013, it was revealed that Chinese buyers had placed significant orders for U.S. grain sorghum, an inferior source of livestock feed that did not contain any unapproved GM traits. In or around October 2013, Chinese officials detected MIR162 in U.S. corn shipments. In November 2013, China began rejecting shipments containing millions of metric tons of U.S. corn because that corn contained the unapproved MIR162. In December 2013, DeLong had a shipment of corn delivered to China that tested positive for MIR162. That shipment was rejected by the Chinese authorities, and it took DeLong several months to

get the product re-loaded and shipped to other buyers in Taiwan. On or about Christmas Day 2013, DDGS buyers learned that Chinese officials intended to begin testing U.S. shipments of DDGS for MIR162. With full knowledge of this trade disruption, Syngenta continued with its plans to launch sales of Duracade in the U.S. in late 2013. The trade disruption was further compounded in July 2014 when Chinese officials issued an order requiring all shipments of U.S. DDGS after July 24 to be accompanied by an official government certification that the shipment did not contain MIR162. The U.S. government, and specifically the United States Department of Agriculture, would not issue such certifications, resulting in a stoppage of U.S. DDGS exports to China until after China approved MIR162. China's de facto ban on U.S. corn exports has caused financial harm to DeLong, who suffered from lost sales volume and margin due to the loss of the large and growing Chinese DDGS export market, as well as losses on specific corn and DDGS sales and purchases, and unsuccessful attempts to mitigate its losses. Internally, Syngenta had discussed its desire to cause a trade disruption that risked the loss of the Chinese market, which Syngenta knew could harm U.S. farmers and exporters.

In conjunction with Syngenta's deceptive campaign, DeLong received two letters in August 2011, written by Chuck Lee, Head of Corn, North America, for Syngenta, in which Syngenta represented that it anticipated Chinese approval of MIR162 in March 2012. Further, a Syngenta representative sent DeLong the China Request Form for BioSafety Certificate in June 2013, which included the option to request a BioSafety

Certificate for MIR162.

And, as detailed below in Section 5, DeLong was harmed.  Syngenta's decision to commercialize put DeLong between a rock and a hard place: lose a market that represented two-thirds of its DDGS sales, or continue selling in an effort to mitigate its potential losses. DeLong chose to mitigate.  Had DeLong just given up on the Chinese market, its losses would be even greater than those sought in this lawsuit.  Beginning in December 2013, China began rejecting DeLong's corn shipments that tested positive for MIR162. At that time, one of DeLong's shipments was detained in a Chinese port, and ultimately required DeLong to pay for the re-export and transportation of the shipment to Taiwan. DeLong established a policy of not accepting MIR162 corn, but due to the zero tolerance testing, DeLong was unable to completely prevent the presence of MIR162 in its product. Thereafter, because of China's zero-tolerance policy, there was a de facto import ban on all U.S. corn and DDGS by summer of 2014, preventing DeLong from selling either corn or DDGS.  The rejections of these exports caused significant losses to DeLong. Additionally, the de facto import ban led to falling prices on corn and DDGS throughout the import market.  DeLong had contracts with existing customers that were cancelled, re-formed at discounts, which required diversion to other markets, or which were not completed due to the presence of MIR162 or falling market prices caused by the Chinese rejection of MIR162.

4827-6471-1370.7

**b.      Contentions of Defendants.**

Syngenta asserts the following defenses in response to plaintiff's allegations:

This case concerns Syngenta's commercialization of safe, effective, U.S.-approved products in the U.S.  Both MIR162 and Event 5307 were commercialized only after each event was fully approved for unrestricted U.S. planting in the United States by all relevant U.S. government agencies: the USDA, the EPA, and the Food and Drug Administration ("FDA").  These agencies found, and there is no dispute, that MIR162 and Event 5307 are safe and effective, and that the events are just as safe and nutritious as food and feed that is derived from conventional corn.  There is likewise no dispute that MIR162 and Event 5307 have been approved for food, feed, and/or cultivation in numerous other countries, including for import into China.

Syngenta is a seed manufacturer and crop protection company.  It has thousands of U.S. employees and its seeds business and research and development functions are centered in the United States.  Syngenta develops, among other things, biotech corn seeds, which enable U.S. producers to group higher volume and better-quality corn using fewer resources, including pesticides.  The availability of biotech seeds has increased farm incomes by billions of dollars and more than 90% of U.S. corn is grown from biotech seeds.

Syngenta began developing MIR162 in the 1990s.  From 1994 until 2010, Syngenta conducted hundreds of trials of MIR162, consistent with all U.S. rules and regulations.  Syngenta invested over $100 million in developing MIR162, which is an award-winning

product that provides a novel and enhanced mode of action that controls certain corn pests unlike any other biotech event available to U.S. farmers.

By the fall 2010, MIR162 had been approved by the United States, Japan, Canada, Mexico, Korea, Taiwan, and other countries. The countries that had approved MIR162 by that time accounted for the consumption of the overwhelming majority of U.S. corn in the prior year. After receiving these approvals, Syngenta began selling Viptera seed, which contains MIR162, in the United States in the fall 2010, for planting in the spring 2011.

Around the time Syngenta began selling Viptera seed (and before it was planted), China launched an anti-dumping investigation into U.S. DDGS. That investigation (unrelated to Syngenta) lasted until mid-2012, and was followed by yet another anti-dumping investigation (unrelated to Syngenta) in 2015 that remains ongoing.

### The National Corn Growers Association and Others Supported the Launch of Viptera

Before initiating the commercialization of Viptera, Syngenta consulted with numerous industry organizations, including the National Corn Growers Association ("NCGA"). The NCGA supported the commercialization of Viptera given U.S. farmers' desire to have access to safe and effective new biotechnologies like MIR162 and because MIR162 had received approval in the U.S. and Japan. At that point, Japan had imported substantial amounts of U.S. corn for more than fifty consecutive years and had implemented a reliable, science-based regulatory system that permitted regulatory review without any preconditions. The NCGA and other industry groups including the U.S. Grains

16

Council also noted that Syngenta's launch of Viptera satisfied the requirements of the voluntary launch policy issued by BIO. Accordingly, the NCGA did not deem it necessary or even request that Syngenta implement any channeling program or limited launch for Viptera.

When Viptera was launched in the United States, China had not yet approved MIR162 for import. Syngenta filed its initial application for import approval in China in March 2010, the earliest opportunity it was allowed to do so under Chinese regulations. When Syngenta filed its MIR162 import approval dossier, it was generally understood that import approval would take approximately two years.

### Syngenta's Application for MIR162 Import Approval in China

Syngenta filed its initial application for MIR162 in China in March 2010 and its completed application including the results of in-country testing for MIR162 in China in November 2011. Based on the common understanding at the time that the Chinese approval process took two years from the time of the initial application, Syngenta's anticipated approval date for MIR162 was the spring of 2012. Syngenta conveyed that estimate to the grain trade.

Other biotech companies were seeking import approval from China for their own events at this same time. In the spring 2012, Syngenta and other biotech companies were told by the Chinese Ministry of Agriculture ("MOA") that approval was imminent. But 2012 turned out to be a year of political transition in China, and not a single new biotech

event by a non-Chinese company was approved.  MOA officials also explained that China would use the biotechnology approval system to control the amount of corn coming into China as part of China's overall food-security policy.

In June 2012, Syngenta and other biotech companies received questions from the MOA on their import approval applications. Syngenta immediately informed farmers and the grain trade, through their respective associations, of these questions.  Over the next 2.5 years, Syngenta received sporadic "questions" from Chinese regulators.  On several occasions, more time elapsed than the 270 days required for MOA action and under Chinese law.  Although Syngenta promptly responded, the questions delayed the process of obtaining approval.  In December 2014, as a result of a political effort by the U.S. government, China approved MIR162 (and other genetically modified seed events by other companies that had also been delayed by China).

### DeLong's Shipments to China and China's Rejection of Corn

Following the launch of Viptera, DeLong entered into contracts with Chinese buyers to deliver U.S. corn and/or DDGS to China.  At the time, DeLong knew that MIR162 was present in the U.S. corn supply and that it could not ensure that its shipments were free of MIR162.  DeLong also knew that MIR162 was not approved in China at all relevant times, including when it entered into contracts to sell corn and/or DDGS to Chinese buyers as well as when it shipped those commodities.  DeLong therefore understood and appreciated that its shipments to China could be rejected based on the presence of MIR162.

In November 2013, China began rejecting certain shipments of U.S. corn because of the purported presence of MIR162.  Although DeLong knew that MIR162 was not approved and knew that corn vessels—including some of its own shipments of U.S. corn— had been rejected because of the purported presence of MIR162, DeLong nonetheless continued to enter into contracts for the sale of corn and/or DDGS to Chinese buyers *after* these initial rejections, continuing into 2014.  In fact, nearly all of the contract damages DeLong seeks relate to contracts it entered into after the rejections began.  DeLong's contemporaneous communications confirm its awareness of the significant and elevated risk of shipping U.S. corn and DDGS to China following those rejections.  Notwithstanding the obvious risk of knowingly selling products to China containing unapproved GM events, DeLong nonetheless entered into these contracts because DeLong believed it could foist the risk of rejection onto its buyers under its sales contracts.

China's rejection of shipments of U.S. corn came shortly after the world price for corn had dropped significantly.  A worldwide drought in 2012 had resulted in record-high corn prices.  In 2013, however, favorable weather worldwide resulted in the largest worldwide corn crop in history, causing U.S. corn prices to drop.  By contrast, as a result of Chinese corn price support policies, the price of Chinese domestic corn remained high. It was only after this gap had emerged, and as China developed a massive surplus of domestic corn, that China began rejecting U.S. corn.  It was widely understood (and confirmed in contemporaneous correspondence by multiple industry participants,

19

including DeLong) that China's motivations for rejecting the U.S. corn were driven by economic or political considerations.  In addition, DeLong's claimed damages are neither cognizable nor supportable because, among other things, (1) the contracts for which DeLong seeks damages were entered into well after it was aware of Chinese rejections; (2) DeLong's expert attributes all of its losses to Syngenta regardless of any causal connection; and (3) DeLong bases its lost margin and lost volume claim on speculative and unfounded projections and an unreliable benchmark.

### *Syngenta's Commercialization of Event 5307*

In 2013, Syngenta received full approval for unrestricted planting in the United States from the USDA, the EPA, and the FDA, for another biotech event, Event 5307.  As with MIR162, these agencies found, and there is no dispute, that Event 5307 is safe and effective, and that corn grown from corn seeds containing Event 5307 was no different in terms of composition, safety, and nutrition than any other corn variety grown in the United States.  Event 5307 was designed to provide protection against corn rootworm, and the timing of U.S. approval was particularly beneficial given the resistance that had developed to other corn rootworm products available on the market at the time.  Event 5307 was first sold and marketed by Syngenta for planting in 2014 as part of its Duracade corn seeds.

Syngenta worked with U.S. farmers and the NCGA to conduct a limited launch of Duracade in 2014.  The limited launch was implemented through a stewardship program called Right to Grow, which was a partnership with Gavilon Grain LLC that provided

certain farmers access to the new technology and specific destinations to sell and market their corn unconnected to export channels.  Right to Grow was supported not only by the NCGA, but also by the American Farm Bureau Federation, America Seed Trade Association, and U.S. Grains Council, among others.  China did not reject any U.S. corn or DDGS shipments because of the presence of Event 5307, nor were any China-bound U.S. corn or DDGS shipments diverted because of the presence of Event 5307.

4.      **LEGAL CLAIMS AND DEFENSES.**

a.      **Legal Claims of Plaintiff.**[4]

DeLong asserts that it is entitled to recover upon the following theories: Syngenta was negligent in the timing, scope and manner in which it commercialized Viptera and Duracade (Count IV of DeLong's Original Complaint, ECF No. 1); and, because of the nature of this conduct, DeLong is entitled to punitive damages (¶ 435 of Count IV of DeLong's Original Complaint, ECF No. 1).

---

[4] DeLong specifically reserves all of its appeal rights with regard to the claims dismissed in the Court's Memorandum and Order granting Defendants' motion to dismiss, ECF No. 23, including the Court's denial of DeLong's request for leave to amend as set forth in footnote 5 therein.

**b.      Defenses of Defendants.**

Syngenta asserts the following defenses:[5]

1.      Any and all actions taken by Syngenta with respect to any of the matters alleged in the Complaint were taken in good faith and in accordance with established practice.

2.      DeLong's claims are barred because Syngenta's alleged conduct was reasonable and based on independent, legitimate business and economic justifications.

3.      DeLong's claims against Syngenta are barred because Syngenta has complied with all applicable government standards and regulations and all applicable standards of care under all laws, regulations, industry practice, and state-of-the-art knowledge.

4.      DeLong's claims are barred because DeLong's alleged injuries and damages were not legally or proximately caused by any acts or omissions by Syngenta and/or were caused, if at all, by the conduct of DeLong and/or third parties over which Syngenta had no authority or control.  Syngenta cannot be held liable for loss of damage caused by such independent persons or entities, whether or not they are parties

---

5      By listing these defenses, Syngenta does not concede that the defenses are affirmative defenses or that it bears the burden of proof.  DeLong denies that these defenses bar or limit its claims in any way, and further denies that it bears the burden of proof on these defenses.

to this action.

5.      DeLong's claims are barred by the doctrines of intervening or superseding cause.

6.      DeLong's claims are barred, in whole or in part, because Syngenta exercised due care and took appropriate precautions against any reasonably foreseeable acts or omissions of third parties and any reasonably foreseeable consequences of such acts or omissions.

7.      DeLong's claims are barred, in whole or in part, by the doctrines of primary and/or secondary assumption of the risk and contributory or comparative fault, including, but not limited to, because of the fact that DeLong voluntarily shipped DDGS to China, when it knew, reasonably should have known, or was willfully blind to the fact that its shipments may have contained (or did contain) detectable traces of MIR162, which it knew was unapproved for import into China, and when it knew that Chinese law provided for the rejection of shipments containing unapproved GM events.

8.      DeLong's claims are preempted in whole or in part by federal or state law, including but not limited to the U.S. Grain Standards Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and federal and state antitrust law insofar as those acts, among other things, preempt

4827-6471-1370.7

any alleged state-law duties upon Syngenta.

9.      DeLong's claims are barred by the economic loss rule and all analogous doctrines (including, for example, the independent duty doctrine).

10.     DeLong's claims are barred, in whole or in part, because DeLong has not suffered, and will not suffer, any injury to a legally protected or cognizable interest by reason of Syngenta's conduct as alleged in the Complaint.

11.     DeLong's claims for punitive damages are barred by the doctrines of waiver, estoppel, unclean hands, and/or *in pari delicto*.

12.     DeLong fails to allege facts or a cause of action against Syngenta sufficient to support a claim for compensatory damages or any other relief (regardless of what may have been pleaded in the Complaint, plaintiff conceded during the pretrial conference that it was not seeking any attorneys' fees and/or legal fees on its remaining negligence claim).

13.     DeLong is not entitled to damages because DeLong's damages, if any, are too legally uncertain, remote, indirect, and/or speculative.

14.     DeLong has failed to mitigate its damages, if any have occurred. DeLong had at all relevant times a duty to take reasonable action to

24

minimize damages sustained as a result of the conduct alleged in the Complaint, and failed to comply with that duty.  DeLong is therefore barred from recovering any damages that might reasonably have been avoided.

15. DeLong's claims are barred because the actions of DeLong and others in the supply chain, as described in the Complaint, caused or contributed to DeLong's alleged damages.

16. No act or omission of Syngenta was malicious, willful, wanton, or fraudulent, nor did Syngenta act with conscious or intentional disregard of or indifference to the rights and safety of DeLong or others or in an egregiously wrongful matter.  The Complaint, therefore, fails to state a claim upon which relief can be granted for punitive damages and such claims should be dismissed.

17. DeLong's claims for punitive damages are in violation of, and barred and/or limited by, Syngenta's state and federal constitutional rights, including Syngenta's rights under the Due Process Clause of the Fifth and Fourteenth Amendments and the Excessive Fines Clause of the Eighth Amendment of the United States Constitution and similar provisions of the constitution, laws, public policies, and Wisconsin law, including Wis. Stat. Ann. § 895.043.

25

18.     DeLong's claims against Syngenta for damages are barred, in whole or in part, because DeLong would be unjustly enriched if allowed to recover any portion of the damages alleged in the Complaint. DeLong's damages, if any, must therefore be offset against any benefits it received.

19.     DeLong's claims are barred to the extent that Wisconsin law does not and cannot apply to conduct that occurred primarily outside the state.

20.     To the extent DeLong has received payments from other sources in satisfaction of its alleged damages, including, but not limited to, any insurance programs, any damages recovered by DeLong from Syngenta must be reduced to the extent required by Wisconsin law.

21.     Syngenta reserves all rights of contribution and/or indemnity and for the apportionment of fault against DeLong and any other persons or entities to the fullest extent permitted by Wisconsin law, including Wis. Stat. § 895.045 and any other applicable statute, common law right, or legal or equitable right.

22.     DeLong's claims are barred because DeLong's acts and omissions, including this lawsuit, seek to unlawfully restrain trade in violation of the law and public policy under federal and state law.

23.     DeLong's claims are barred to the extent they rely on statements that

26

are constitutionally protected and/or are statements reflecting opinion, puffery, predictions, or expectations.

24.     DeLong's claims are barred to the extent it seeks to import liability based on petitioning, speech, or conduct by Syngenta that is protected by the First Amendment and/or by analogous state statutes, including but not limited to the lawsuit brought by Syngenta in *Syngenta Seeds, Inc. v. Bunge N. Am.*, No. 11-cv-4074-MWB (N.D. Iowa); statements made by Syngenta to the USDA, EPA, and FDA, including in its petitions for deregulation of MIR162 and Event 5307; and Syngenta's other interactions with government agencies.

25.     To the extent DeLong's alleged damages were caused by a misuse of any Syngenta product, there can be no liability against Syngenta.

26.     Even assuming DeLong establishes any liability for negligence on Syngenta's part, the extent to which DeLong may pursue certain theories and recover damages is limited by the applicable statute of limitations.

27.     DeLong's claims are barred because Syngenta owed no legal duty to DeLong.

4827-6471-1370.7

5.      **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**[6]

DeLong seeks all damages that Syngenta's conduct is shown to have caused in accordance with Wisconsin negligence law.  Inclusive of these damages is the impact Syngenta's conduct had on the volume and margins of DeLong's DDGS exports from July 2014 through February 2015.  But for Syngenta's conduct, DeLong's would have entered into a volume of DDGS export sales consistent with its higher historical sales, at a higher margin than what DeLong ultimately received.  Furthermore, but for Syngenta's conduct, DeLong suffered losses on specific corn sales, specific DDGS sales, and specific DDGS purchases.  DeLong also unsuccessfully attempted to mitigate its losses on DDGS exports through certain barge transactions and corn spread trades, which resulted in further losses that DeLong would not have suffered but for Syngenta's conduct.

Based upon data available to Dr. Colin Carter, DeLong's damages expert, as of the date of his July 17, 2020 report, DeLong's total damages are approximately $17.756 million, plus an additional approximate $4.643 million in prejudgment interest by applying an appropriate 4.25% annual interest rate under Wisconsin law from the point at which DeLong's past losses stopped accruing (February 2015) through the April 26, 2021 trial date.[7]  DeLong's actual damages are broken down in Dr. Carter's report as follows:

---

[6]      Syngenta denies that DeLong has suffered any damages recoverable from Syngenta.

[7]      Damage figures over $1 million have been rounded off in this order.  The specific amounts are listed out in Dr. Carter's report.

- Lost Volume Damages:                  $6.031 million

- Lost Margin Damages:                  $8.068 million

- Specific Corn Sales Losses:           $619,947

- Barge Transaction Losses:             $1.834 million

- Corn Spread Transaction Losses:       $858,188

- Specific DDGS Sales Losses:           $1.975 million

- Specific DDGS Purchase Losses:        $685,970

DeLong's Lost Volume and Lost Margin Damages are offset by $2.318 million due to increased sales of milo during the damage period.  In addition to these actual damages, DeLong seeks punitive damages.[8]

DeLong provided to Syngenta Dr. Carter's expert report and reliance materials.  His report contains detailed analyses of the nature of, bases for and calculations of the damages.[9]  Dr. Carter gave a deposition in DeLong's case.

<u>Lost Volume and Lost Margin Damages</u>

---

[8]      DeLong may also present evidence regarding the amounts and calculations of some of its actual damages through some of its employees who will testify live at trial. DeLong employees will testify regarding how it was impacted by Syngenta's decision to prematurely commercialize MIR162, including testifying about specific purchase and sale contracts, communications with customers, out-of-pocket costs and losses, and provide evidence related to specific and general damage calculations.

[9]      In an effort to shorten this section, DeLong and Syngenta are in agreement that DeLong may incorporate by reference Dr. Carter's expert damages reports.  Syngenta will be serving its responsive reports on DeLong on September 18..

4827-6471-1370.7

For purposes of calculating DeLong's Lost Volume and Lost Margin Damages, Dr. Carter established a benchmark period to calculate what DeLong's DDGS margins and export volumes would have been but for the trade disruption.  The benchmark period was representative of DeLong's export performance in a but-for world.  Dr. Carter determined the damage period began in July 2014 – the month after Chinese authorities (i) began rigorously testing for MIR162 in DDGS imports from the United States, and (ii) stopped issuing import permits for DDGS.  On July 23, 2014, Chinese authorities announced they would begin requiring official certification from the country of origin that the DDGS shipments did not contain MIR162.  Dr. Carter determined the damage period continued to February 2015.

To calculate DeLong's Lost Margin Damages, Dr. Carter calculated DeLong's gross profit margin and calculated that during the benchmark period, DeLong's average gross profit margin on its DDGS exports to all markets was $17.99 per metric ton.  During the damage period, DeLong had an average gross margin loss for its shipped DDGS sales of $5.24 per metric ton, resulting in a $23.23 per metric ton lost margin.

Prior to the trade disruption, China accounted for over 65% of DeLong's DDGS exports in fiscal year 2013/2014.  In calculating Lost Volume Damages, Dr. Carter used data on exports to all destinations because the trade disruption materially affected the entire DDGS market serviced by DeLong.  As explained in his report, Dr. Carter calculated that during the damage period, DeLong's average monthly volume of DDGS exports fell by

approximately 46,000 metric tons to an average of 43,416 metric tons of DDGS exports per month.  In calculating the losses, Dr. Carter subtracted 29,395 metric tons of DDGS that are separately included in DeLong's specific DDGS sales losses.

Based on his analysis, Dr. Carter calculated DeLong's Lost Margin Damages to be $8.068 million.  This figure is reached by taking DeLong's average of 43,416 metric tons of DDGS shipped each month during the damage period, multiplying that figure by the average margin loss of $23.23, and then multiplying that figure by 8 for each month included in the damage period.  Dr. Carter also calculated the Lost Volume Damages to be $6.033 million.  This figure is reached by taking DeLong's total lost volume over the damage period of 335,401 metric tons and multiplying it by DeLong's but-for $17.99 average gross profit margin.[10]

Dr. Carter offset DeLong's Lost Margin and Lost Volume Damages with DeLong's milo exports from June 2014 through February 2015.  According to Dr. Carter, this business did not exist prior to the trade disruption because China preferred to import corn instead of milo.  During the offset period, DeLong exported 82,682 metric tons of milo.  In calculating the milo offset, Dr. Carter used DeLong's actual margins earned on this business during the offset period.  The total gross margin earned during the period was $2.66 million.  However, Dr. Carter noted that DeLong invested $342,551 in capital

---

[10]     The aggregate damage calculations are set forth in this section.  Dr. Carter's Lost Volume and Lost Margin damage calculations are set forth in Tables 2 through 5 of his report.

improvements to enable the transloading of milo.  After accounting for the capital expenditure, the milo offset totaled $2.318 million.

Dr. Carter performed a robustness check to account for the possibility that DDGS sales are seasonal.  Under this alternative analysis, Dr. Carter compared an 8-month benchmark period from July 2013 through February 2014 to the damage period of July 2014 through February 2015.  Dr. Carter found that by using this alternative 8-month benchmark period, DeLong's Lost Volume Damages increased by $1.22 million, but its Lost Margin Damages decreased by $0.26 million, resulting in a net increase of $0.96 million in damages.[11]

Specific Corn Sales Losses

DeLong also suffered losses on three contracts to ship corn to China in 2013, which total $619,947.39.  *First,* DeLong sold approximately 4,000 metric tons of corn to COFCO (USA) Inc. (COFCO) under Contract No. 44722.  The contract price was $282.00 per metric ton.  The contract volume was divided into multiple shipments.  As explained in Dr. Carter's report, DeLong ultimately suffered losses totaling $539,245.04 on this contract, comprised of out-of-pocket costs in the amount of $315,006.41, which included, *inter alia*, additional costs for logistics, fumigation, diversion fees, and USDA inspection fees, and $224,238.63 in market losses.

---

[11]      The detailed calculations associated with Dr. Carter's robustness check can be found in Tables 7 through 9 of his report.

*Second*, DeLong also sold approximately 3,000 metric tons of corn at $260 per metric ton to CP Trading (China) Co., Ltd. (CP Trading), under Contract No. 47496.  As explained in Dr. Carter's report, DeLong ultimately suffered a loss of $14,762.62 from this contract.

*Third*, DeLong contracted with COFCO for the sale of 10,000 metric tons of corn under Contract No. 47438 at $1.92/bushel above the December 2013 CBOT price, with the final price to be set by the buyer through December 2013 CBOT futures.  As explained in Dr. Carter's report, DeLong suffered a loss of $65,939.73 from this contract.

Specific DDGS Sales Losses

DeLong also suffered $1,974,936 in losses on specific DDGS sales due to the trade disruption, which are detailed in Section 6.2 and Appendix A of Dr. Carter's report.  Most of those losses were associated with canceled contracts.  The losses for cancelled contracts are calculated as the difference between the contract price and the market price for DDGS on the date of cancelation.  Any payments received from the customer, or other agreed-upon discounts provided by DeLong, on those contracts were also credited against the loss.

DeLong also suffered losses on a shipment of DDGS that was rejected by Chinese officials due to MIR162.  As explained in Dr. Carter's report, DeLong suffered a loss of $60,000 on the sale.  Further, DeLong suffered damages as a result of a Chinese purchaser's non-performance on three contracts and the subsequent costs of diversion and re-

consignment, calculated under a National Grain and Feed Association arbitration decision.[12]

Specific Purchase Losses

DeLong does not purchase DDGS to fill a particular sale once the sale is booked. Instead, DeLong maintains an aggregate position on DDGS that it uses to fulfill sales orders.  As a result of the trade disruption and the loss of the Chinese market, DeLong had purchased more DDGS than necessary to complete its sales.  Because those purchases came with specific delivery periods, DeLong was forced to cancel the purchases and wash out those transactions at a loss of $685,970.  A breakdown of the loss associated with each purchase is in Appendix C (Table 13) to Dr. Carter's report.

Corn Spread Transaction Losses

On December 26, 2013, in reaction to DeLong hearing that China would begin testing DDGS for MIR162, DeLong entered into futures spread transactions for the months of March, July and December 2014 to try to mitigate any potential losses from the company's DDGS position.  DeLong "shorted" (i.e., sold) the nearby futures contracts for March 2014, and "went long" (i.e., purchased) the more distant futures contracts for July and December 2014.  DeLong did this anticipating that the inter-temporal price spread (distant minus nearby futures) would increase.  DeLong ultimately suffered a loss of

---

[12]     A breakdown of DeLong's losses on each sale are provided in Appendix A (Table 11) and Appendix B (Table 12) to Dr. Carter's report.

$856,187.50 from these trades.  This realized overall loss on the transactions is reflected in DeLong's monthly statements from Rand Financial.

Barge Transactions

To further mitigate its risk of excess DDGS that could not be shipped overseas due to the trade disruption, DeLong entered into three forward contracts to sell 18,000 short tons of DDGS on 12 barges.  Delivery for these contracts was to occur from January through March 2014.  DeLong delivered on three of the 12 barges, and washed out the remaining nine.  The washouts included both traditional two-party washouts and also through three-party "applications" where DeLong contracted with a third-party merchant to fulfill the contract.  DeLong suffered total losses of $1,834,094 on the three forward contracts.  For the three loaded and delivered barges, DeLong lost $387,693.37, which was calculated as the difference between the market price for DDGS on the day of loading and delivery versus the contract price. For the nine wash outs, DeLong lost $1,446,401.13, which was the difference between the contract price DeLong received and the price DeLong paid to washout or fulfill the contract.

**6.     AMENDMENTS TO PLEADINGS.**

None.[13]

---

[13]     DeLong specifically reserves all of its appeal rights with regard to the Court's denial of DeLong's Motion for Leave to Amend in response to Syngenta's Motion to Dismiss certain claims.  ECF No. 23.

4827-6471-1370.7

## 7.    DISCOVERY.

Fact discovery is complete.  DeLong disclosed its retained and non-retained experts on July 17, 2020, and discovery from DeLong's experts was to have been completed by August 21, 2020.  On August 20, 2020, Syngenta filed its Motion to Compel Discovery or to Strike Plaintiff's Expert Disclosures of Randal Giroux and Joseph Keaschall (the "Motion to Strike") (ECF No. 63), which the Court denied on September 4, 2020 (ECF No. 67) in a ruling discussed below in Section 8(a).

As set forth in greater detail below at Section 8(a), the parties continue to dispute the admissibility of Dr. Giroux and Dr. Keaschall's opinions.  Those issues can, and may, be addressed in the manner set forth in the Court's September 4 order.  Syngenta disclosed its experts on September 18, 2020.  Discovery from Syngenta's experts is to be completed by October 22, 2020.

Unopposed discovery may continue by agreement after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  DeLong supplemented its initial disclosures on May 21, 2020 as required by the Court's original Scheduling Order (ECF No. 11).  Per the parties' request, this  Court will remain available to resolve any disputes that arise during the course of such extended discovery (the court will decide later whether any such disputes are timely raised).

## 8.    MOTIONS.

### a.      Pending Motions.

On August 20, 2020, Syngenta filed its Motion to Compel Discovery or to Strike Plaintiff's Expert Disclosures of Randal Giroux and Joseph Keaschall (the "Motion to Strike") (ECF No. 63), DeLong filed a response in opposition (ECF No. 65), and Syngenta filed a reply in support (ECF No. 66).  The Court denied the Motion to Strike on September 4, 2020 (ECF No. 67) in a ruling stating that Syngenta should first subpoena Giroux. Syngenta did so on September 4, 2020.  On September 11, 2020, Giroux filed a Motion to Quash in the District of Minnesota.   On September 14, 2020, Syngenta notified the District of Minnesota of this Court's willingness to accept transfer of the subpoena dispute, as stated in this Court's September 4 ruling; on September 18, 2020, Syngenta filed a Motion to Transfer in the District of Minnesota.  Giroux's Motion to Quash and Syngenta's Motion to Transfer are both scheduled for hearing on October 9, 2020 before U.S. District Judge Eric T. Tostrud.

Additionally, the parties dispute the admissibility of Dr. Keaschall's prior expert testimony. *See* ECF Nos. 63, 65, 66. Dr. Keaschall has sadly passed away since his prior testimony in the MDL. Per the Court's Order (ECF No. 67), any motions in limine related to Dr. Keaschall's testimony must be filed by the October 23, 2020 deadline for *Daubert* motions. *See* ECF No. 67 at 7.

### b.      Additional Pretrial Motions.

After the pretrial conference, the parties intend to file the following motions:

1.      Summary judgment motions;

2.      *Daubert* motions; and

3.      Potential in limine motions prior to trial.

The dispositive-motion deadline, as established in the scheduling order and any amendments (*see* ECF No. 56), is **October 27, 2020;** briefs in opposition to such motions must be filed by **November 24, 2020**, and any reply briefs must be filed by **December 22, 2020**.

The parties should follow the summary-judgment guidelines available on the Court's website:

http://www.ksd.uscourts.gov/summary-judgment/

The parties believe they need more than the 30 pages allowed by D. Kan. Rule 7.1(e) for the arguments and authorities sections of their summary judgment briefs or memoranda. The page limit is extended in this complex case to 60 pages for the argument and authorities sections of each movant and opposing party. As agreed by the parties, each side shall file a single, comprehensive summary judgment motion, instead of separate motions on discrete issues.  Further, for any movant, the 60-page limit is a combined one, i.e., it includes both the opening brief(s) and any reply brief(s), so counsel should plan accordingly.

The parties will discuss potential ways to narrow summary judgment and *Daubert* briefing based on the Court's prior rulings in the overall litigation, and are additionally

38

discussing a process for addressing sealing issues related to summary judgment and *Daubert* briefing, similar to the Stipulation and Order, ECF No. 2854, in 2:14-md-02591.

      **c.**    **Motions Regarding Expert Testimony.**  All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, as established in the scheduling order and any amendments (*see* ECF No. 56), must be filed by **October 23, 2020**, briefs in opposition to such motions must be filed by **November 20, 2020**, and any reply briefs must be filed by **December 18, 2020**.  Given the parties' ongoing dispute regarding Mr. Giroux, Syngenta may need to seek leave to extend the *Daubert* deadline with respect to Mr. Giroux, depending on if and when he is deposed, pursuant to the guidance contained in the Court's September 4 ruling. The discovery cutoff for Syngenta's experts is October 22.  Nonetheless, in light of the October 23 *Daubert* deadline, DeLong has requested that those depositions proceed between September 30 and October 14.  The parties will continue to meet and confer in good faith about whether an extension of any *Daubert* deadlines is warranted.  Consistent with ECF No. 2788 in 2:14-md-02591, the parties are meeting and conferring about the scope of *Daubert* briefing in light of rulings previously issued in the overall litigation, and if such briefing is narrowed, a process to ensure that arguments with regard to these previous motions to exclude testimony of expert witnesses are preserved for appeal of this trial.

9.     **TRIAL.**

The trial setting, as established in the scheduling order and any amendments, is

**April 26, 2021, at 9:30 a.m., in Kansas City, Kansas.** This case will be tried by jury.

Trial is expected to take approximately 15-20 court days.[14] The court will attempt to

decide any timely filed dispositive motions approximately 60 days before trial. If the case

remains at issue after timely dispositive motions have been decided, then the trial judge

may convene another pretrial conference (or simply enter a separate order) to address,

among other things, the setting of deadlines for filing final witness and exhibit disclosures,

exchanging and marking trial exhibits, designating deposition testimony for presentation

at trial, motions in limine, and proposed jury instructions.

During the pretrial conference, counsel reported no meaningful settlement

discussions have occurred in several months.  Both sides, however, expressed some

interest in resuming negotiations once expert deposition discovery is complete.  Judge

O'Hara indicated he would conduct a settlement conference if the parties agreed that

would be productive.

IT IS SO ORDERED.

Dated October 7, 2020, at Kansas City, Kansas.

---

[14]     DeLong has requested 20 court days based on the length of the Kansas class trial, the quantity and likely examination time for different live witnesses, and the unknown time for Syngenta's case-in-chief.  Syngenta suggested 15 court days.  The parties will continue to confer, and if they are able to more accurately estimate the number of court days, they will advise the Court.

    s/ John W. Lungstrum
John W. Lungstrum
U.S. District Judge


    s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

4827-6471-1370.7